nUNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JANIS NOONE, | ) |
| | ) |
| Plaintiff, | )    14 C 2673 |
| | ) |
| vs. | )    Judge Feinerman |
| | ) |
| PRESENCE HOSPITALS PRV d/b/a PRESENCE | ) |
| MERCY MEDICAL CENTER, | ) |
| | ) |
| Defendant. | ) |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Janis Noone alleges that her former employer, Presence Hospitals PRV d/b/a Presence

Mercy Medical Center, violated the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601

*et seq.*, by terminating her in retaliation for requesting FMLA leave. Doc. 1. With discovery

completed and a jury trial set for February 22, 2016, Doc. 27, Presence has moved for summary

judgment, Doc. 38. The motion is granted.

**Background**

The following facts are set forth as favorably to Noone as the record and Local Rule 56.1

permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). On summary judgment, the

court must assume the truth of those facts, but does not vouch for them. *See Smith v. Bray*, 681

F.3d 888, 892 (7th Cir. 2012).

Noone started working at Presence, a hospital, in 2007 as a full time clinical educator for

critical care services, and later was promoted to clinical manager of the Intensive Care Unit.

Doc. 47 at ¶¶ 6, 11. She supervised about fifty nurses and was responsible for managing other

employees. *Id*. at ¶¶ 12-13. Noone received a copy of and agreed to abide by the hospital's

"Standards of Behavior." *Id*. at ¶¶ 7-8. She was a Leader-level employee; Presence holds

Leader-level employees to a higher standard of behavior than staff-level employees and does not use a formal discipline process with them. *Id*. at ¶¶ 10-11.

Noone was responsible for completing performance evaluations for employees reporting to her. *Id*. at ¶ 25. In mid-June 2013, a benefits specialist sent Noone several emails asking her to complete a particular employee evaluation so that the employee could receive her annual merit increase. *Id*. at ¶¶ 26-28. Lisa Adamczyk, who in May or June 2013 had become Noone's supervisor, *id*. at ¶ 24, was copied on the emails, and twelve days after the initial email was sent, Adamczyk wrote to Noone: "Jan, Please. Just Do It!" *Id*. at ¶ 29. The same day, Adamczyk sent Noone an email concerning a different matter, saying: "Jan, we do not need to be making tons of excuses. … it is YOUR responsibility to work with the rest of the team to get them the tools [and training] they need. … I would have expected you to take those in my email and coordinate how to achieve the request." *Id*. at ¶ 30.

In late June or early July 2013, Jilaina Taylor, one of Noone's subordinates, informed Adamczyk in writing that she was quitting because of Noone. *Id*. at ¶ 32. Taylor explained that she could not trust Noone, that Noone had improperly disclosed her personal information, and that Noone was having people watch her at work. *Ibid*. Noone objects on hearsay grounds to the court's consideration of Taylor's letter. *Ibid*.

"[H]earsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial." *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997); *see also Wigod v. Chi. Mercantile Exch.*, 981 F.2d 1510, 1519 (7th Cir. 1992) ("[t]o be considered" at summary judgment, "statements by the unidentified parties must either be non-hearsay pursuant to Federal Rule of Evidence 801, or must qualify for a hearsay exception pursuant to Federal Rule of Evidence 803"). Hearsay is an out-of-court statement offered "to prove the truth of the

matter asserted in the statement." Fed. R. Evid. 801(c). Presence contends that Taylor's letter is not offered for the truth of the matters asserted therein—*i.e.*, that Taylor could not trust Noone, that Noone had improperly disclosed her personal information, and that Noone was having her watched at work—but rather only to show the effect that the letter had on Adamczyk. Doc. 62 at 5. That is a non-hearsay purpose, and the court will consider Taylor's letter only for that purpose. *See Boutros v. Avis Rent A Car Sys., LLC*, 802 F.3d 918, 924-25 (7th Cir. 2015) (holding that out-of-court statements "presented not for their truth but as evidence of Avis's reasons for suspending and then firing" the plaintiff to be "clearly probative" as to whether Avis fired the plaintiff for nondiscriminatory reasons); *Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 796 (7th Cir. 2015) (holding that a negative reference from an anonymous staff member of the plaintiff's former employer was not inadmissible hearsay because it had been "considered not for its truth, but to show its effect on the state of mind" of the defendant hospital in rejecting the plaintiff's application for medical staff privileges); *United States v. Hanson*, 994 F.2d 403, 406 (7th Cir. 1993) ("An out of court statement that is offered to show its effect on the hearer's state of mind is not hearsay."); *Corral v. Chi. Faucet Co.*, 2000 WL 628981, at *5 & n.4 (N.D. Ill. Mar. 9, 2000) (holding that a co-worker's statement that the plaintiff had made a threat was "admissible on summary judgment not for the truth of the matter asserted, but to show [the decisionmaker's] state of mind and reason for recommending [the plaintiff's] termination").

Although Noone disputes the accuracy of Adamczyk's assessment of her work, Noone admits that Adamczyk told her that she arrived to work too late and left work too early and that it was difficult finding her whenever she was needed. Doc. 47 at ¶ 34. On July 8, 2013, Adamczyk met with the Director of Human Resources Carol Hook and Chief Nursing Officer Eileen Gillespie to discuss terminating Noone's employment. *Id*. at ¶¶ 24, 35, 37. Adamczyk

requested the meeting "because she was concerned about civility issues occurring in the Intensive Care Unit, Noone's failure to meet evaluation and payroll deadlines, and inappropriate communications between Noone and staff members." *Id*. at ¶ 37. At the end of the meeting, Adamczyk, Hook, and Gillespie decided that "Adamczyk would continue to obtain additional information about the situation." *Ibid*.

On July 17 and July 19, 2013, Noone called in sick. *Id*. at ¶ 56. On July 19, Noone contacted the Unum Group, Presence's third-party leave administrator, to request intermittent FMLA leave beginning on July 17 due to hip pain. *Id*. at ¶ 57; Doc. 48-2 at ¶ 4.

Also on July 19, Marci Lemus, who reported to Noone, showed Adamczyk screenshots of text messages that she had received from Noone. Doc. 47 at ¶ 38. Adamczyk confirmed that the phone number from which the messages originated matched the number on record for Noone. *Id*. at ¶ 39. The texts used nicknames that Adamczyk interpreted as mocking other employees. *Id*. at ¶¶ 42-43. For instance, Adamczyk believed that "KatieKong" referred to an employee named Katie who was tall, and that "lkauratard" referred to a nursing supervisor named Laura who had an eye twitch and spoke with a stutter. *Id*. at ¶ 43. One text included a photo of a transgender nurse named Sylvia, taken without her knowledge, with the caption: "And I'm among the shameless who can't pass up a great picture." *Id*. at ¶ 41. Another text read: "If your husband wore a dress and you stayed for that creepshow wouldn't that be a confirmed diagnosis of crazyfool?" *Id*. at ¶ 42. Adamczyk interpreted that text as referring to Sylvia and her wife, a nursing supervisor at Presence. *Id*. at ¶ 43. Noone's texts also referred to a subordinate's vagina and another subordinate's testicles, and used explicit language throughout. *Id*. at ¶ 42. In her brief, Noone concedes that during her employment she "exchanged communications by text and email with other nurses which were of questionable taste." Doc. 48 at 2.

Upon reviewing the texts, Adamczyk decided that Noone should be terminated.  Doc. 47 at ¶¶ 44, 46.  On July 22, Adamczyk showed the texts to Hook; Gillespie supported Adamczyk's recommendation that Noone be terminated.  *Id*. at ¶¶ 45, 47.  Hook, Adamczyk, and Gillespie met and spoke between July 22 and July 30 to finalize everything needed for Noone's termination.  *Id*. at ¶ 48.

On July 30, Noone was terminated; she received this notice of termination:

> As a Leader, you have been previously reminded of the expectation for you to role-model our Standards of Behavior and supervise staff to ensure adherence to all hospital policies and procedures.  Once again, there are serious concerns related to your poor leadership skills and overall sense of judgment.  This is evidenced by extremely inappropriate text messages to staff and your leader, pictures taken of staff without their knowledge and for the purpose of ridicule and inappropriate conversations with staff individually and within meetings.  These actions violate Presence Health policies and expectations.  Based on the foregoing, the decision has been made that your employment with Presence Mercy Medical Center is terminated effective today.

*Id*. at ¶ 49.  Presence's Standards of Behavior have no express policy regarding the sending of inappropriate texts to other employees, although "Respect" and "Professionalism" are listed as core values.  *Id*. at ¶ 9; Doc. 49 at ¶ 2.  After being fired, Noone emailed Adamczyk expressing disappointment that she had not been afforded the opportunity to resign, writing "I understand your decision" and "[i]f given the opportunity, I would have gladly resigned today."  Doc. 47 at ¶ 54.  Noone testified that she understood how the text messages could be viewed as inappropriate.  *Id*. at ¶ 52.

The parties dispute whether Adamczyk, Gillespie, and Hook were aware, at the time the termination decision was reached, of Noone's need and request for FMLA leave.  Noone submits that they were on notice that she had applied for FMLA leave and would have applied for future leave after hip replacement surgery.  Doc. 49 at ¶ 1.  It is undisputed that Noone advised Hook that she would need future time off for hip replacement surgery, although there is no evidence

that Hook knew that Noone had already taken off July 17 and 19. Doc. 61 at ¶ 1. The more pertinent issue is whether Adamczyk, the principal decisionmaker, knew at the time she decided to terminate Noone that Noone had applied or would need to apply for FMLA leave. Unum sent Adamczyk an email on July 22 (three days after Adamczyk decided to fire Noone, but about a week before the actual termination) stating that Noone had requested intermittent FMLA leave. Doc. 47 at ¶ 59.

Adamczyk testified that she did not recall receiving that email, *id*. at ¶ 60, but Noone avers in an affidavit that Adamczyk asked her in July 2013 how she would get paid while on FMLA leave, Doc. 48-2 at ¶ 7. Noone also avers that she told Adamczyk that she had been consulting with her doctor to schedule hip replacement surgery and that she thought it would be soon given her increased pain and difficulty walking. *Ibid*. Presence argues that those averments in Noone's affidavit should be disregarded because they contradict her deposition testimony. Doc. 61 at ¶ 1. According to Presence's response to Noone's Local Rule 56.1(b)(3)(C) statement—the relevant pages of Noone's deposition transcript are not in the record—Noone testified as follows:

> Q. What exactly did [Adamczyk] ask you?
>
> A. She said, Do you know how your pay will come—where your pay will come out of for your FMLA, like, some FMLA fund or your own PTO, and I answered her … I told her what the policy was. That you use the PTO and then it's EIB. …
>
> Q. And did the two of you say anything else during this conversation?
>
> A. She was in the unit and, you know, I don't recall if we talked about other things. …
>
> Q. You don't know whether [Adamczyk] knew that you were seeking to take any future time off, do you?
>
> A. I don't know.

Doc. 61 at ¶ 1.

"Where deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1995). Noone's deposition testimony does not conflict with her affidavit. Noone testified that she could not remember if she and Adamczyk had discussed her need for FMLA leave, while the affidavit recounts the details of just such a conversation. Because the deposition indicates nothing more than "a lapse of memory," *ibid.*, the court will consider the affidavit and concludes that a reasonable jury could find that Adamczyk knew that Noone planned to request FMLA leave in the near future. *See Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1007 (7th Cir. 1999) ("[W]here the deposition testimony is ambiguous or incomplete, as it is here, the witness may legitimately clarify or expand upon that testimony by way of an affidavit."); *Russell*, 51 F.3d at 68 (distinguishing between affidavits that contradict deposition testimony and those that "merely clarify[] or augment[]" the testimony).

Noone also avers in her affidavit that she informed Gillespie that she would need FMLA time "for the [hip] operation and rehabilitation if a conservative approach failed." Doc. 48-2 at ¶ 5. Likewise, Gillespie testified that she knew that Noone had hip issues and "would need to have a surgical intervention and need time away." Doc. 61 at ¶ 1. Presence makes much of the fact that Noone would have needed leave only "*if* a conservative approach failed." But a reasonably jury could find that this was sufficient notice of Noone's need for FMLA leave, even if that need was not yet an absolute certainty.

One more evidentiary issue warrants discussion. From 2009 to 2011, several employees complained about receiving inappropriate messages from Noone. Doc. 47 at ¶¶ 14-22. Among other things, Noone wrote in a Facebook message to a subordinate that three coworkers "are all new women all slimmed down" and that one of them "has lost her camel toe." *Id*. at ¶ 17. In February 2011, Vice President of Patient Care Services Suzette Mahneke sent Noone a memorandum explaining that her conduct warranted immediate termination but that she would be given one last chance. *Id*. at ¶¶ 14, 22-23.

Noone argues that those complaints and Mahneke's "last chance" letter are irrelevant for present purposes because Adamczyk did not know about them when deciding to terminate her. *Id*. at ¶¶ 14-23. "[A] court may consider only admissible evidence in assessing a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009); *see also Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 533 (7th Cir. 2003). Adamczyk testified that she had not discussed Noone with Mahneke and had not seen anything that Mahneke had written about Noone until after she had reviewed the offensive text messages and was "compiling information for her termination." Doc. 42-3 at 12. In an abundance of caution, the court does not consider the 2009-2011 evidence in determining whether a reasonable jury could find that Adamczyk had a retaliatory motive in terminating Noone. *See Norris v. City & Cnty. of San Francisco*, 900 F.2d 1326, 1331 (9th Cir. 1990) ("[I]nformation about [the plaintiff] which was unknown to [the decisionmaker] at the time the decision was made could not have entered into the calculus of the decision and would be entirely irrelevant."); *Denson v. Ne. Ill. Reg'l Commuter R.R. Corp.*, 2002 WL 15710, at *3 (N.D. Ill. Jan. 4, 2002) (declining to consider disciplinary actions described in plaintiff's personnel file because "past employment history is only relevant to the extent relied upon by the persons making the adverse employment decisions that are challenged").

**Discussion**

Noone's sole claim is for FMLA retaliation. Doc. 11 at 1; Doc. 24 at 1; Doc. 41 at 3-10; Doc. 48 at 4-10. The FMLA "makes it unlawful for an employer to retaliate against an employee who exercises his FMLA rights." *Carter v. Chi. State Univ.*, 778 F.3d 651, 657 (7th Cir. 2015) (citing 29 U.S.C. § 2615(a)(2), (b)); *see also Scruggs v. Carrier Corp.*, 688 F.3d 821, 825 (7th Cir. 2012); *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 978 (7th Cir. 2008); *Kauffman v. Fed. Exp. Corp.*, 426 F.3d 880, 884 (7th Cir. 2005). The court assesses "a claim of FMLA retaliation in the same manner that [it] would evaluate a claim of retaliation under other employment statutes, such as the ADA or Title VII." *Burnett v. LFW Inc.*, 472 F.3d 471, 481 n.5 (7th Cir. 2006); *see also Scruggs*, 688 F.3d at 826; *Smith v. Hope Sch.*, 560 F.3d 694, 702 (7th Cir. 2009); *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 593 (7th Cir. 2008); *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). Thus, Noone may defend her FMLA retaliation claim from summary judgment under either the direct or indirect methods of proof. *See Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 799 (7th Cir. 2014); *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 828 (7th Cir. 2012).

To forestall summary judgment under the direct method, Noone "must show: (1) [s]he engaged in a protected activity; (2) [her] employer took an adverse employment action against [her]; and (3) there is a causal connection between the protected activity and the adverse employment action." *Pagel v. TIN Inc.*, 695 F.3d 622, 631 (7th Cir. 2012); *see also Malin v. Hospira, Inc.*, 762 F.3d 552, 562 (7th Cir. 2014); *Langenbach*, 761 F.3d at 799; *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 633 (7th Cir. 2009). Noone requested FMLA leave and was fired, satisfying the first two elements. *See King v. Preferred Technical Grp.*, 166 F.3d 887, 893 (7th Cir. 1999) ("[The plaintiff] engaged in protected activity by taking leave pursuant to the FMLA,

and [the defendant's] termination of [the plaintiff] qualifies as an adverse employment decision.").  The third element, a causal connection, can be shown by "providing evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the [employment action]."  *Carter*, 778 F.3d at 659 (alteration in original).

A plaintiff proceeding under the direct method may establish causation "by presenting sufficient evidence, either direct or circumstantial, that the employer's discriminatory animus motivated an adverse employment action."  *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012).  Noone "does not need to prove that retaliation was the *only* reason for her termination; she may establish an FMLA retaliation claim by showing that the protected conduct was a substantial or motivating factor in the employer's decision."  *Goelzer v. Sheboygan Cnty.*, 604 F.3d 987, 995 (7th Cir. 2010) (internal quotation marks omitted).  The appropriate focus under the direct method "is not whether the evidence offered is direct or circumstantial but rather whether the evidence points directly to a discriminatory reason for the employer's action."  *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008) (internal quotation marks omitted); *see also Morgan v. SVT, LLC*, 724 F.3d 990, 997 (7th Cir. 2013) ("The plaintiff's task in opposing a motion for summary judgment is straightforward: he must produce enough evidence, whether direct or circumstantial, to permit the trier of fact to find that his employer took an adverse action against him because of his race."); *Everett v. Cook Cnty.*, 655 F.3d 723, 729 (7th Cir. 2011); *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 672 (7th Cir. 2011).

"Direct evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption. In short, direct evidence essentially requires an admission by the decision-maker that his actions

were based upon the prohibited animus." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (citations and internal quotation marks omitted); *see also Morgan*, 724 F.3d at 995; *Coleman*, 667 F.3d at 860; *Everett*, 655 F.3d at 729. The record unsurprisingly does not include any direct evidence that Noone was fired because she had requested or would need FMLA leave.

In the absence of direct evidence, "[a] plaintiff can … prevail under the direct method of proof by constructing a 'convincing mosaic' of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker. That circumstantial evidence, however, must point directly to a discriminatory reason for the employer's action." *Rhodes*, 359 F.3d at 504 (citations and internal quotation marks omitted); *see also Chaib v. Indiana*, 744 F.3d 974, 982 (7th Cir. 2014); *Perez v. Thorntons, Inc.*, 731 F.3d 699, 710 (7th Cir. 2013); *Morgan*, 724 F.3d at 995-96; *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1105 (7th Cir. 2012); *Everett*, 655 F.3d at 729 (explaining that circumstantial evidence is "evidence that points to discriminatory animus through a longer chain of inferences"). In the context of a retaliation claim, "circumstantial evidence may include suspicious timing, ambiguous statements from which a retaliatory intent can be drawn, evidence of similar employees being treated differently, or evidence that the employer offered a pretextual reason for the termination." *Pagel*, 695 F.3d at 631. To overcome summary judgment, circumstantial evidence need not "combine to form a tidy, coherent picture of discrimination, in the same way the tiles of a mosaic come together to form a tidy, coherent image, in order for a plaintiff to survive summary judgment." *Morgan*, 724 F.3d at 997. Rather, "[i]f the plaintiff can assemble from various scraps of circumstantial evidence enough to allow the trier of fact to conclude that it is more likely than not that discrimination lay behind the adverse action, then summary judgment for the defendant is not

appropriate, and the plaintiff may prevail at trial even without producing any 'direct' proof." *Id.* at 996.

Noone attempts to defeat summary judgment by pointing to the close temporal proximity between her request for FMLA leave and her termination. In support, she cites the Seventh Circuit's 1999 decision in *King v. Preferred Technical Group*, *supra*, which suggested that suspicious timing alone established a causal connection between the plaintiff's discharge and her taking FMLA leave:

> This [causal connection] element may be satisfied by reference to the temporal proximity between King's taking of the protected leave and her termination. Generally, a plaintiff may establish such a link through evidence that the discharge took place on the heels of protected activity. Evidence demonstrating such a connection is generally enough to satisfy the third element of the prima facie test. PTG terminated King only one day after she completed her leave of absence under the FMLA. Such a close proximity is sufficient to establish a prima facie case of retaliation.

166 F.3d at 893 (citations and internal quotation marks omitted).

In more recent decisions, however, the Seventh Circuit has made clear that "temporal proximity between an employee's protected activity and an adverse employment action is rarely sufficient to show that the former caused the latter." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011); *see also Harden v. Marion Cnty. Sheriff's Dep't*, 799 F.3d 857, 862 (7th Cir. 2015) ("Temporal proximity between an employee's protected activity and an adverse employment action is rarely enough to show causation."); *Silk v. Bd. of Trs., Moraine Valley Cmty. Coll., Dist. No. 524*, 795 F.3d 698, 710 (7th Cir. 2015) (same); *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 389-90 (7th Cir. 2012) (same); *Coleman*, 667 F.3d at 860 (same); *Cole v. Illinois*, 562 F.3d 812, 816 (7th Cir. 2009) (same); *Simpson v. Office of Chief Judge of Circuit Court*, 559 F.3d 706, 713 (7th Cir. 2009) ("[A]n employee's termination while she was on leave could, in some circumstances, create an inference of employer impropriety: if, for example, a

supervisor who had been aware of problems with an employee did not decide to fire the

employee until she took leave, and the supervisor based the firing on the incidents of which the

employer had already been aware. But the timing of termination is not, by itself, a ticket to

trial.") (citation and internal quotation marks omitted); *Culver v. Gorman & Co.*, 416 F.3d 540,

546 (7th Cir. 2005) (although suspicious timing is "often an important evidentiary ally of the

plaintiff," the court "may permit a [retaliation] plaintiff to survive summary judgment if there is

other evidence that supports the inference of a causal link"). In so doing, the Seventh Circuit has

cautioned that courts must evaluate evidence of suspicious timing in the context of the record as

a whole:

> Suspicious timing may be just that—suspicious—and a suspicion is not
> enough to get past a motion for summary judgment. Occasionally, however,
> an adverse action comes so close on the heels of a protected act that an
> inference of causation is sensible. Deciding when the inference is appropriate
> … depends on context, just as an evaluation of context is essential to
> determine whether an employer's explanation is fishy enough to support an
> inference that the real reason must be discriminatory.

*Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011) (citations omitted). If the

context indisputably shows that an employee's protected activity or characteristic did not cause

an adverse action, temporal proximity alone cannot establish the causation necessary to forestall

summary judgment. *See Davis*, 651 F.3d at 675 ("These comparisons [to cases where temporal

proximity helped to establish causation] are apt only if we close our eyes to the other facts of this

case. In asserting that the proximity of events here similarly implies causation, Davis completely

ignores the elephant in the room: the questionable transaction in which he engaged."); *Buie*, 366

F.3d at 509 ("[G]iven Buie's myriad problems at work, a reasonable jury could not conclude

from timing alone that Quad/Graphics suspended or fired Buie because of his announcement that

he had AIDS and, implicitly, because he would thus be requesting benefits under the FMLA.");

*Bohman v. Cnty. of Wood*, 2004 WL 1563209, at *5 (W.D. Wis. July 7, 2004) (rejecting the

plaintiff's FMLA retaliation claim, despite suspicious timing, because "a temporal sequence analysis is not a magical formula which results in a finding of a discriminatory cause") (internal quotation marks omitted).

Although the timing of Noone's termination, standing alone, may appear suspicious—Adamczyk decided to fire Noone on her second day of FMLA leave, while aware of her need for future FMLA leave—the context provided by the record as a whole would not permit a reasonable jury to find a causal connection between Noone's FMLA activity and Adamczyk's decision to fire her. As described above, during the month preceding Noone's termination, Adamczyk expressed displeasure regarding Noone's performance, including her sluggish preparation of an employee evaluation, her making excuses, and her failure to ensure that her team received necessary training. At about the same time, one of Noone's subordinates told Adamczyk that she was quitting because, among other things, Noone had improperly disclosed her personal information. These incidents preceded Adamczyk's meeting with Hook and Gillespie to discuss terminating Noone; the meeting was prompted by Adamczyk's concern with Noone's failure to meet deadlines and inappropriate communications with staff members, and it concluded with an agreement that Adamczyk would obtain additional information. Less than two weeks later, with Noone already skating on very thin ice, Adamczyk was shown the highly offensive texts that Noone had sent to a subordinate, texts that any reasonable observer could view as disparaging fellow employees based on disability, physical appearance, and gender identity. It is no wonder that Adamczyk proceeded to conclude that Noone should be fired.

Noone submits that she had no performance issues, citing to positive evaluations that she had received in 2010, 2011, and 2012. Doc. 49 at ¶ 3. As promised, the court will put aside the fact that Noone's performance during that time frame was not all that terrific, as she had been the

subject of several complaints from 2009-2011 and had received a "last chance" letter in February 2011. The important point here is that the causation inquiry focuses on whether Noone's performance was adequate at the time of her termination. *See Dear v. Shinseki*, 578 F.3d 605, 610 (7th Cir. 2009) ("When considering whether an employee is meeting an employer's legitimate expectations, this court looks to whether she was performing adequately at the time of the adverse employment action."). Recall that Adamczyk had become Noone's supervisor in May or June 2013, and from what Adamczyk saw during the one or two months she supervised Noone, Noone's performance was sub-par, a combination of ineffective, inefficient, and offensive. Thus, that Noone had received positive feedback from 2010-2012 would not allow a reasonable jury to conclude that Adamczyk's reason for terminating her in July 2013 was due to her taking FMLA leave.

The only contemporaneous feedback Noone points to is an email sent by Gillespie on July 16, 2013, stating that Noone "facilitated ICU going to get patients when ED staff was tied up." Doc. 48-12 at 3. Noone introduces this evidence only in her brief, Doc. 48 at 5; it appears nowhere in her Local Rule 56.1(b)(3)(B) response or Local Rule 56.1(b)(3)(C) statement of additional facts. The court therefore will not consider the email. *See FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 634 (7th Cir. 2005) ("We have noted before that rules like 56.1 'provide[] the only acceptable means of disputing the other party's facts and of presenting additional facts to the district court.'") (quoting *Midwest Imps., Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995)) (alteration in the original); *Dunhill Asset Servs. III, LLC v. Tinberg*, 2012 WL 3028334, at *3 (N.D. Ill. July 23, 2012) ("Under settled law, facts asserted in a brief but not presented in a Local Rule 56.1 statement are disregarded in resolving a summary judgment motion.") (internal quotation marks omitted). And even if the court considered the email, one

sentence in one email confirming that Noone was performing some of her duties would not

create a genuine issue as to whether Adamczyk fired her in retaliation for taking FMLA leave.

Noone next argues that the offensive text messages did not provide a sufficient basis for

her termination, and therefore that Adamczyk's reliance on the texts was pretext. Doc. 48 at 5.

According to Noone, the messages were sent over a year before her termination, and their

language and tone mirrored the daily conversations between employees and "would not make a

network television censor blink." *Id*. at 5-6. The fact that the texts were more than a year old

when Lemus showed them to Adamczyk is of little consequence; what matters is that Adamczyk

learned about them just before the termination.

With respect to the texts' language and tone, Noone asserts that Lemus "never once asked

me to stop texting her or complained about the content of any text" and that "Katie Kong" was a

nickname used in Katie's presence and "she never objected to it." Doc. 48-2 at ¶ 14. Quoting

*Kampmier v. Emeritus Corp.*, 472 F.3d 930 (7th Cir. 2007), Noone submits that "the occasional

vulgar banter, tinged with sexual innuendo of coarse or boorish workers generally does not

create a work environment that a reasonable person would find intolerable." *Id*. at 941 (internal

quotation marks omitted). The Seventh Circuit wrote that in the context of deciding whether a

plaintiff had a viable Title VII sexual harassment claim. But even if Noone's texts were not

severe and pervasive enough to create a hostile work environment under Title VII, they still

could provide ample grounds for termination. An employer is entitled to expect more from its

employees, particularly supervisory employees, than that they will not be *so* inappropriate,

derogatory, and insulting as to create a Title VII violation. And while Katie might not have

minded being called "Katie Kong," Noone does not suggest that Laura (the nursing supervisor

with an eye twitch and stutter) embraced being called "lkauratard" or that Sylvia (the transgender

nurse) appreciated having her gender identity and appearance ridiculed and her relationship with her wife compared to a "creepshow."

Noone next argues that Adamczyk failed to account for Lemus's motive and bias in showing her the texts; at the time, Noone was disciplining Lemus for absenteeism and other behavioral issues.  Doc. 48 at 5; Doc. 49 at ¶ 6.  Whatever Lemus's motives may have been, they matter only to the extent they undermine Lemus's credibility, which in turn matters only to the extent her credibility affected whether Adamczyk honestly believed her allegations.  But the record indisputably shows that Adamczyk did not take Lemus at her word.  Rather, Adamczyk compared the phone number from which the texts were sent to the number that the hospital had on record for Noone to confirm that the texts originated from Noone's phone.  Doc. 47 at ¶ 39.

In another effort to buttress her pretext argument, Noone points to a photograph that Adamczyk texted to Noone just two weeks before her dismissal; the photograph is of a child in swim trunks with the caption "My nephew," and tucked into the child's waistband are a suggestively positioned toy water gun and a label for Oscar Mayer Jumbo Wieners.  Doc. 53. Noone uses the photograph, which she implausibly charges was "arguably child pornography," to suggest that Adamczyk could not sincerely have objected to Noone's texts given that Adamczyk herself was sending offensive texts to a subordinate.  While Adamczyk's text was in extremely poor taste, it differed in an important respect from Noone's texts; Adamczyk's conveyed a crude joke reminiscent of something one could hear in a middle school cafeteria, while Noone's texts ridiculed and degraded other hospital employees, including her subordinates, based on disability, appearance, and gender identity.  No reasonable jury could find that because Adamczyk texted Noone a tasteless photo of a nephew, she did not genuinely

believe that Noone's texts, together with her many other shortcomings as an employee, warranted her termination, or that her taking FMLA leave played any causal role in the firing.

Because she cannot forestall summary judgment under the direct method, Noone must rely on the indirect method. Under the indirect method, an FMLA plaintiff must first make out a *prima facie* case of retaliation, which requires her to establish that (1) she engaged in statutorily protected activity; (2) she was meeting her employer's legitimate expectations; (3) she suffered a materially adverse action; and (4) she was treated less favorably than some similarly situated employee who did not engage in the statutorily protected activity. *See Carter*, 778 F.3d at 660; *Langenbach*, 761 F.3d at 800. Once the plaintiff has done so, "the defendant[] must articulate a legitimate, non-discriminatory reason for the employment action." *Carter*, 778 F.3d at 660. The burden then shifts back to the plaintiff to show that the defendant's proffered explanation is pretextual. *Ibid*.

Noone fails to establish a *prima facie* case for two reasons. First, she cannot show that she was meeting Presence's legitimate work expectations. As noted above, even before seeing Noone's texts, Adamczyk expressed severe dissatisfaction with Noone's work, so much so that she called a meeting to discuss terminating her. Moreover, it is undisputed that Leader-level employees like Noone were held to higher standards than staff employees and that Presence's Standards of Behavior listed "Respect" and "Professionalism" as core values; Noone's texts certainly could have been viewed as seriously undermining those values. And again, although Noone received positive evaluations from 2010-2012, the critical inquiry is not whether she performed adequately in the past, but whether she was doing so at the time of her termination. *See Dear*, 578 F.3d at 610 (explaining that, when considering whether an employee was meeting her employer's legitimate expectations, "this court looks to whether she was performing

adequately at the time of the adverse employment action"); *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 753 (7th Cir. 2006) (holding that a prior positive evaluation was insufficient to create a genuine issue as to whether the plaintiff was meeting the employer's legitimate work expectations); *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 901 (7th Cir. 2005) (holding that the Title VII plaintiff failed to establish that she was meeting her employer's legitimate expectations at the time of her termination, despite a "laudable twenty-two year performance record"); *Fortier v. Ameritech Mobile Commc'ns, Inc.*, 161 F.3d 1106, 1113 (7th Cir. 1998) ("[E]arlier evaluations cannot, by themselves, demonstrate the adequacy of performance at the crucial time when the employment action is taken."). For the reasons given above, Noone cannot show that she was meeting Presence's legitimate expectations when she was fired. *See Langenbach*, 761 F.3d at 800-01 (holding that the plaintiff "cannot make out a case for FMLA retaliation using the indirect method" where there was "voluminous evidence" that she was not meeting her employer's expectations, despite comments by her supervisor that she was "doing great"); *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) (holding that favorable performance reviews from the previous eight years were insufficient to create a genuine issue where the plaintiff's job performance had recently deteriorated).

Noone also cannot establish that she was treated less favorably than any similarly situated employee. "To be similarly situated, an employee must be directly comparable in all material respects." *Cherif v. McDonald*, 617 F. App'x 571, 574 (7th Cir. 2015). Accordingly, "[t]o be a sufficiently similar comparator, the individual ordinarily should have dealt with the same supervisor, been subject to the same standards, and engaged in similar conduct of comparable seriousness." *Woods v. City of Berwyn*, 803 F.3d 865, 872 (7th Cir. 2015); *see also Coleman*, 667 F.3d at 847 ("In the usual case a plaintiff must at least show that the comparators (1) dealt

with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.") (internal quotation marks omitted). The Seventh Circuit has expressly "cautioned that, in order to show that a coworker is similarly situated to a terminated employee, the employee must show that the other coworker had a comparable set of failings." *Burks*, 464 F.3d at 751 (internal quotation marks omitted). "Whether a co-worker is similarly situated is typically a question for the factfinder, but summary judgment is appropriate where no reasonable jury could find the plaintiff has met her burden." *Langenbach*, 761 F.3d at 802.

Noone argues that Adamczyk is a similarly situated employee because she sent a subordinate (Noone) a "sexually explicit photograph," did not request FMLA leave, and was not terminated. Doc. 48 at 9-10. Adamczyk did not have a comparable set of failings to Noone's, and thus is an insufficient comparator, for two reasons. First, as discussed above, Adamczyk's text is significantly different from a workplace perspective than Noone's texts. Second, there is no evidence that Adamczyk's supervisor (Gillespie) had any other concerns regarding her performance; by contrast, at the time Adamczyk saw Noone's texts, Noone already was suffering from such serious performance problems that Adamczyk had called a meeting to discuss terminating her. Accordingly, Adamczyk does not qualify as a similarly situated employee.

Because she has failed to identify an appropriate comparator and cannot show that she was meeting Presence's legitimate work expectations, Noone fails to establish a *prima facie* case and thus cannot defeat summary judgment under the indirect method.

**Conclusion**

For the foregoing reasons, Presence's summary judgment motion is granted.   Judgment will be entered in favor of Presence and against Noone.

December 7, 2015

_____
United States District Judge